The next matter on the docket this morning is case number 123989. People of the state of Illinois v. Marshall v. Ashley. Good morning, Your Honors. Jonathan Yeaston of the State Appellate Defender on behalf of Mr. Ashley. Counsel, and may it please the Court, two years ago this Court unanimously found that the provision of the amended stalking statute that criminalized communications to or about a person that would knowingly or negligibly cause emotional distress was overbroad and therefore facially unconstitutional in violation of the First Amendment. This case deals with the next provision over in that statute. That same enactment that this Court took part out of in Relaford, the legislature also criminalized threatening when the speaker knew or ought to know who caused the distress. The threatening provision is just as unconstitutionally overbroad as the communications provision that this Court struck in Relaford. Whether we look at this under the free speech overbreath framework, whether we look at it as a content-based statute that needs to be narrowly tailored to a compelling purpose, or whether we look at subsection A as a whole under the due process framework and whether it suites an instant conduct, we get the same result, which is certainly the same result. This is a case that largely hinges on what we think of the true threats exception to the First Amendment. Now, there's two reasons why this statute, the threatens provision of subsections A and C, violate the First Amendment and exceed the true threats provision. But first, the true threats exception to the First Amendment is limited to threats at the very least of illegal acts and probably of violent crimes. But when the legislature broadened the statute, it removed the requirement that what threatened had to be a threat of a violent crime. So now the statute sweeps in such ordinary protected discourse as a boss threatening to fire an employee, a banker threatening to foreclose on a home, or as argued in the briefs, an activist threatening to boycott a corporation. The second reason is that the true threats exception requires that the speaker intend to convey a threat or at least know that his words will be construed as a threat. This is the issue that came up in United States v. Alonis, and this is the controversial issue on where courts are split today. But the better reading there is that when the U.S. Supreme Court said that a true threat is one where the speaker means to convey a threat, that it used the word means with a significance. Because this statute creates a felony out of misstating words, somebody else misconstrues as a threat and places us at jeopardy of prosecution for others' reasonable misinterpretations of what we say. It exceeds the true threats exception and therefore fails the First Amendment. First, Your Honors, the statute is far too broad as to what is threatened. One of the reasons that this Court of Relaford found the communications provision unconstitutional was in part because an activist advocating a boycott could theoretically be prosecuted under the communications provision because his advocacy of a boycott of a polluting corporation might end up emotionally distressing the owner of that corporation who fears a boycott on the law's business. There's no meaningful difference between an activist who advocates for a boycott and an activist who threatens one. Where the statute here just uses this bare term threatens, unlike the old statute, it sweeps in that example just as much as it was swept in under Relaford. And there's other examples of the kind of speech that is swept in that are threats in some sense but aren't threats for purposes of the true threats exception. The Maraccio decision from the First District recently offered the example of a banker threatening to foreclose. The banker might have every lawful right to do so, but of course the homeowner that receives a threat to their house is going to be emotionally distressed by that communication. The Seals v. McBee case out of the Fifth Circuit that we discussed, that was a Louisiana statute that barred threatening a public official, but with no requirement that the threat be an unlawful one, that statute swept in the examples of an arrestee threatening a police officer who's unlawfully arresting him with calling a lawyer or a politician threatening to vote against a bill if he doesn't have support for another piece of legislation. These are all examples of protected speech, but they're all swept in when the word threaten is left alone. Now, the state's large response to all this is to say, well, we can read the word threaten to additionally say that, like the old statute, the threat has to be a threat of immediate or future bodily harm, sexual assault, confinement, or restraint. The state says, let's use the doctrine of constitutional avoidance and narrow this thing down, that the legislature, despite what they enacted, really must have meant this special technical sense of the term. Now, there's a number of reasons why the doctrine of constitutional avoidance can't work in this case. The first is that when we look to the plain language of the term threaten, the term threaten naturally falls within all these contexts. It makes sense in natural English use to talk about a spouse threatening a divorce, an advocate threatening to boycott, or a banker threatening to foreclose. We're not using the term threaten in any kind of tongue-in-cheek sense there, and this is shown by the dictionary definitions. The state and Mr. Ashley trade back and forth various dictionary definitions, but as Mr. Ashley's reply brief points out, well, there's lots of contexts in which these Merriam-Webster's and the Oxford definitions have come up, and they've come up in examples where what is threatened isn't a threat of a violent crime at all, such as there's case law out there citing the definitions to describe an attorney threatening to withdraw from representing a client, or a debt collector threatening to inform another debtor's neighbors about their debt. And we know that the legislature could not have reasonably intended the term threaten alone to mean only threats of violent crime because it also banned all communications to or about somebody that negligently distressed, including whether or not they were threats. The fact that the legislature in the very next term over in the same legislative enactment put such a broad term as communicates to or about meant that the legislature intended the statute to be read broadly. That is verified by the legislative history, where that legislative history is the expressed purpose there is to broaden the statute. Where there's a purpose of broadening of the statute, that is the opposite of giving support for a narrowing construction. And then we go to the statutory history itself. We still have a definition of threats in Illinois law that limits the threats to violent crime. That's the predecessor statute that's now under subsection A3 that required the threat to be a threat of immediate or future bodily harm, sexual assault, confinement, or restraint. The legislature knows how to specify that a threat's going to be a threat of violent crime. We can see that in A3. But when they enacted the new statute, they deleted that limitation. So to read in that the threat has to be a threat of violent crime or of an unlawful act into the bare word threatens in this statute would require not only reading in a limitation that the legislature did not express, it would require reading in a limitation that the legislature expressly deleted in adopting the new statute. Your Honors, the danger of all this is that a lot of ordinary discourse is threats. Whether we're talking about the politicians who threatens to vote against the bill lawfully, the seals example of the arrestee who lawfully threatens to call his attorney, or the banker threatening to foreclose, or the spouse threatening to divorce. These are all protected speech. To reach all these examples of protected speech adds nothing to being able to prosecute stalking because the core concern with stalking is threats that might escalate to violence. A regime that prosecutes all these other examples is simply far too overbroad and is an abject failure of tailoring of the statute. Now there's a second reason that the statute violates the First Amendment, the true threats exception, and that's as to the mental state. The statute allows a conviction for words that one would, that a recipient would reasonably understand as a threat even if it wasn't intended to be a threat. This is a consequence of that language in the statute, using a negligence mental state of saying knows or should know would cause the target emotional distress. When we go so far as to allow prosecution based on others' reasonable interpretations of what is said, rather than the speaker's intent, that creates the risk that communications intended as a joke, intended as sarcasm, or intended as hyperbole become the basis for imprisonment. And speakers begin to censor themselves lest their words become misinterpreted. Now the question of what mental state, the true threats exception requires, went up to the United States Supreme Court in the Alonis decision. They resolved that on a purely statutory basis. But that purely statutory basis gives a fairly strong indication of what the U.S. Supreme Court thinks of this. At the very least, the U.S. Supreme Court, in that Alonis decision, put a fairly bright tell that they do not think that a negligence mental state is enough. Indeed, Justice Roberts was so concerned about these examples of a joke that they read in a knowing mental state statute. Now because there's an expressed mental state in the Stoffman statute, that option of interpreting the statute to read in a new and additional mental state is not there. This Court's precedent is pretty clear with that. When there's at least one mental state in a statute, we can't go adding in additional ones to save its constitutionality. And that's the Carpenter case that's in there. Instead, this Court, like the U.S. Supreme Court did in the Virginia v. Black case, needs to strike the threatened provision as facially unconstitutional. When we look at the Virginia v. Black case, there's all sorts of hallmarks in that decision that the U.S. Supreme Court believes that true threats require intentionality. The Court defines a true threat as encompassing statements where the speaker means to communicate a serious expression of an intent from an act of unlawful violence to a particular individual or group of individuals. Those words, means to communicate, strongly signify that they expect the speaker to have the intent. Elsewhere, the decision talks about how intimidation in the constitutionally prescribable sense requires intent. And the briefs offer different examples of how the language from this and other U.S. Supreme Court opinions strongly indicate that intent to convey a threat is constitutionally required. I'd point out that I believe still pending is a motion from Mr. Ashley to cite additional authority, the Becker case out of the Kansas Supreme Court. That case does an excellent detailed rundown, line by line, of all the major U.S. Supreme Court decisions on this topic and ends up concluding that intent is required and, therefore, it struck a portion of one of Kansas' Supreme Court. So, counsel, your position is it's the intent of the speaker and not the intent of a reasonable listener? The intent of the speaker is required. That the First Amendment requires that the speaker intend to convey a threat, or I suppose it would be possible, it might be acceptable to say that the speaker knowingly conveys a threat, in other words, knowing that the recipient would understand it as a threat. But when we talk about how a reasonable person would interpret the words, that alone is not enough. Now, we can use a reasonable person's standard. Hasn't the law indicated the true threats by their very utterance inflict injury? Yes, Your Honor, and that's one of the reasons there's a true threats exception in the first place. So we look to how- So why wouldn't it be the listener that's important rather than the speaker? Because the risk of censorship of individuals based on others' misinterpretations of what they say. And I'd point out here that requiring the speaker to have a particular mental state is a common feature of First Amendment exceptions. For example, in a Senate-based prosecution, the First Amendment requires that the possessor know that the material is obscene. In libel cases, when the public figure is at issue, it requires actual knowledge of the actual malice standard. That we have these standards in all these First Amendment exceptions, so that speakers don't inadvertently stray into falling into an exception. And there wouldn't be protection in it being a reasonable listener standard? No, Your Honor. I'd actually point to the U.S. Supreme Court decisions in Lonis, which says, well, a reasonable listener standard is essentially a negligent standard. It says, we can prosecute you if your words, though you didn't mean it this way, could have reasonably been interpreted as a threat. That you ought to have known better than to say what you said. And especially when we look at today's political context, I think this is important. Because one way to generate clicks and generate donations is for politicians to interpret some words that their opponent might have said as a threat. And so we have these dueling interpretations that to have a First Amendment exception that places one's guilt of a felony at a consequence of the mere negligent effects of their words is simply an invitation to county prosecutors out there to have to pick and choose which ambiguous, potentially threatening phrases might be the basis of felony prosecutions. Your Honor, that Kansas case does give one example of this that I think is helpful. It offers the example of Black Lives Matters protesters playing rap music at a rally where the lyrics talk about killing the police. Now, sure, I can imagine a circumstance that despite the protester's intent, they're just there to rally, that somebody out there could, and the prosecutor's closing argument, could make a great claim that a reasonable person would understand that as a threat. The danger is that in circumstances like that, a broad First Amendment exception becomes a pretext to silence dissenting voices. Your Honor, as I'd like to turn to the additional constitutional issue of the briefs, which is our due process claim. Now, instead of just looking at subsection C's term, threatens, here we're looking at subsection A as a whole. And when you look at subsection A as a whole, you recognize it for what it is, which is a general felony statute prohibiting the negligent infliction of emotional distress. Now, whether we talk about this under this Court's long-used framework of striking down statutes that sweep in misconduct, or whether we look at arbitrary prosecution, a free state cannot have a general prohibition on the negligent infliction of emotional distress with the threat of felony prosecution. The brief gives all sorts of examples of the kind of things we do in our daily lives that knowingly or negligently cause another person significant emotional distress. I think it's easier just to look to the annals of court law. Just about every IIAD case that's been before this Court, every non-frivolous claim of negligent inflection of emotional distress is transformed into the basis of a possible felony prosecution by the statute. And the problem is, because there is so much action by our citizenry toward one another that may cause or knowingly cause emotional distress, the state can't possibly prosecute all of these. Instead, piecemeal enforcement is the inevitable result, and that's arbitrariness, and that arbitrariness violates the due process laws. In some sense, this looks like the gang loitering ordinance that Chicago had a few years ago that this Court struck down, where, well, we can roll up anybody on the street who's standing there with another gang member, and we'll leave it to the cops to decide who's actually worth it. Because this crime is effectively committed by just about everyone on a regular basis, it's creating an option for the police and prosecutors to go after just about anyone when they want to charge, but they don't have any other basis to do so. For that reason, it violates the due process. I see my time is short. If this Court has no further questions, I'd ask that you reverse the appellate court's judgment, hold the threatened provision of subsection C and subsection A of the Stockton statute unconstitutional, and reverse Mr. Ashley's convictions. Thank you, Your Honors. Thank you. Mr. Eustone. Mr. Fisher. Good morning, Your Honors. I'm Counselor Arthur Mantis, the Court Assistant Attorney General of Arson Fisher for the People. Your Honors, I'd like to start with the defendant's first amendment challenge to the statute. If I may, the first thing that the Court needs to do in resolving that challenge is to figure out exactly what the statute says, because the Court can't determine whether the statute sweeps overly broad without knowing exactly what speech it is, in fact, criminalizing. In resolving that question, the Supreme Court has made clear that this Court should keep the commands of the first amendment firmly in mind. That means that if it is at all reasonably possible to interpret the statute to preserve its constitutionality, and the Court must do so, overbreadth is strong medicine. It doesn't only invalidate the unconstitutional applications of the statute, it invalidates the plainly constitutional applications of that statute. This case is a perfect example. If the Court were to find that the threat and its provision were overbroad, it wouldn't only invalidate arguably unconstitutional applications that were, it would invalidate a case such as this one, where the defendant engaged in speech that the General Assembly plainly can criminalize. So, where it is reasonably possible to interpret a statute to preserve its constitutionality, the Court should do so. And here, where the General Assembly has chosen to use a word, threat, that has a very specific meaning in the first amendment context, here in the context of a statute that is criminalizing speech, it is certainly reasonable to interpret the General Assembly as meaning that word exactly the way that it has always meant in the first amendment context. Threat does have a specific meaning in the first amendment context. It is a sincere, another sincere intent to inflict an unlawful injury on another. And that threat has to be, it can't be hyperbole, it can't be mere political discourse, and that is the way it has to be a true threat. But we know what threat means in the first amendment context, and it's certainly reasonable to believe that the General Assembly meant threat in this first amendment context in exactly that way. That's especially true when you consider subsection D2. Now certainly, the exception in D2 that says that the section is not intended to criminalize the lawful exercise of free speech can't save an unconstitutional provision of the statute. But it does indicate the General Assembly's intent that its language be cabined by the commands of the first amendment. So here, where it's chosen to use a word that is understood in a very particular way in the first amendment context, it is an indication that the General Assembly's intent was that that word be understood in exactly that manner. In Watts, the Supreme Court said that threats are what we distinguish from protected speech. So the General Assembly knew what it was doing when it used the word threats, that that was a specific category of unprotected speech. The defendant puts forward this much broader definition of the word threaten that essentially asks the court to strike it down based on the same reasoning that it used in Rallifer to strike down the communicates to or about language. But that language is very different. That's not language that has a very particular meaning within the first amendment context. And contrary to the argument the defendant makes, that that indicates an intent by the General Assembly to regulate speech in an overly broad manner, the use of that overly broad term, the court's already shut down that term in Rallifer, the use of that overly broad term in contrast to the use of the word threat, which has this specific meaning, demonstrates that in terms of the threatens provision, the General Assembly was talking about this very specific category of unprotected speech. The defendant argues that it would be unreasonable to reach that interpretation statute with the dictionary definition of threats. People argue that the dictionary definition of threats is in fact entirely compatible with the first amendment context definition of threats. But even if it were a reasonable interpretation of threats to apply the broader definition, Supreme Court has made clear that in the over breadth context, that's not good enough. There has to be no reasonable interpretation of the statute that would preserve its constitutionality and succeed on an over breadth challenge. And it's simply not the case here where the court can reach the conclusion quite reasonably that it probably gives the best effect to the General Assembly's intent in using the word threaten, that it meant that word exactly the way that it's always used in the context of the statutes that criminalize speech. There is this second first amendment question that is presented to this court in this case, and that's whether a threat requires only that an objective listener would understand it as a sincere expression of sincere intent to commit an unlawful injury, or whether the speaker's intent must be that it is perceived in that way. This isn't really a mens rea question. Everyone agrees that the speaker has to have intended to communicate the threat. The statute requires the course of conduct to be intentional, but it's really about what constitutes a threat. The appellate court held that it didn't matter which definition of threat it used because the defendant's speech in this case could satisfy either the objective standard or the subjective standard, and so it didn't have to reach the question. But if this court disagrees with that conclusion by the appellate court, the objective standard is the better standard, a better way to define a threat. First off, even after Virginia v. Black, most of the circuit courts have agreed that Virginia v. Black did not actually create a requirement for speech to constitute a threat. The speaker had to have intended for it to be perceived as a threat, and that makes sense because the objective standard, as Justice Thomas indicated, better advances the purpose of the threat's exception to the First Amendment. As the court articulated, the purpose of this exception to First Amendment protections is to protect listeners against fear and the mental suffering that threats engender, and whether or not the speaker intended for the speech to be perceived as a threat of a reasonable person would understand it to be a threat, then the consequences, the harm that the exception is meant to protect against is present. The defendant argues that the objective standard doesn't adequately protect free speech, but this is belied by the very history of the threat's exception in the Supreme Court. If you look back at Watts, the speaker in that case said, I want to get the President of the United States in the sights of my rifle, and the court had no problem using an objective standard to say that a reasonable person would understand this in context to be political rhetoric or hyperbole as opposed to a true, sincere, real threat. In fact, because of the application of context to understanding when a threat is meant as hyperbole or political rhetoric versus a sincere threat is exactly the objective listener standard that does provide protection for free speech, for the kind of political rhetoric that, for example, the Kansas court is concerned about the use of rap lyrics in Black Lives Matter rally, but the objective standard would absolutely protect that kind of speech from being prosecuted as a threat because a reasonable listener would understand it to be either for purposes of entertainment or political rhetoric at one end and not an expression of a sincere intent to actually inflict that harm on police officers. And looking at Virginia v. Black, which, again, most circuit courts, even after Black, have continued to apply an objective standard. They've said that Black doesn't create a new subjective test to determine whether speech constitutes a threat. Black was dealing with a very different kind of statute, and so the issue wasn't really in front of the court as it considered that statute. In this case, we have a statute that says that stalking can be comprised of threats. The course of conduct constituting stalking can include threats. Now, whether specific speech actually is a threat, there might be some close cases of interpretation to determine whether the language that the speaker used in the context actually constitutes a threat, but it explicitly applies to threats. By contrast, the Virginia statute took a specific communication, and then said, we're going to presume that that specific communication is always a threat, and that creates a very different sort of problem under the First Amendment. So courts consistently believe that there is an objective standard to define what was a threat before Virginia v. Black, and it makes sense that in the wake of Virginia v. Black, the majority of circuits continued to apply that same standard, didn't view Virginia v. Black as creating a new standard based on the subject of intent of the speaker, both because that wouldn't really advance the purpose of the exception. It doesn't actually add anything meaningful to the protection of free speech, and because Virginia v. Black wasn't really purporting to address that same kind of question. And as the defendant concedes, Alonis really wasn't dealing with the question at all. At the end of the day, all Alonis held was that, as a matter of statutory interpretation, where the statute was silent as to mens rea, that because typically knowing or intentional are the standards that we usually apply in criminal statutes, that that would be the appropriate standard for the court to read into that statute. It didn't purport to address any First Amendment or even due process concerns. And this court in Relaford already rejected the argument that Alonis in any way should dictate an outcome regarding the constitutionality of the power of stopping the statute. Turning more briefly, I think, to the due process challenge, in terms of the actual language threatened in the free speech provision, if the court holds that threats means what threats always means in this kind of context, and therefore the statute is not over-broadened in the First Amendment, then it necessarily follows that at least that portion of the statute is not overly broadened in the due process provision, because, as mentioned, the purpose of the threats exception to protect people from fear and the emotional distress that threats engender is exactly what the General Assembly, or one of the purposes the General Assembly had in enacting the stalking statute. And, of course, the statute is only violated with due process if it criminalizes a substantial amount of conduct wholly unrelated to the General Assembly's purpose. So the whole statute is cabined by these elements, and it only applies to a course of conduct where the defendant should have known that it was going to cause the victim to fear for her safety or experience significant mental suffering. Emotional distress is defined in the statute, and it's got a fairly high burden defined into it, significant mental suffering. So I think the statute itself, by its very elements, limits itself to only those courses of conduct that do apply to this General Assembly's purpose in passing the statute of protecting victims from fear and from significant mental suffering that stalking causes. Unless the Court has any questions, people would ask that this Court affirm the appellate court's opinion. Although you touched on the idea that the legislature passed this legislation knowing that First Amendment speech is protected, you didn't comment on subsection D2 exemptions, the section does not apply to an exercise of the right to free speech for assembly that is otherwise lawful. Do you think that is a savings clause? I think it is relevant, Your Honor. As I mentioned, it can't save an otherwise unconstitutional statute, but when we're dealing with the question of statutory interpretation and we're saying, did the General Assembly mean threats? When it said that the course of conduct constituting stalking can include threats, did it mean for that to only criminalize the kind of speech that is distinguished from protected speech by the threats doctrine? The fact that they explicitly said, we are not intending to criminalize protected speech, which I think very much is evidence of the General Assembly's intent that threats be read the way that it is always read in the First Amendment context. So, again, it's not, as the Court held in Relaford, it's not going to save language like communicates to or about, but when we're using a term here that has a meaning in the context of criminalizing speech, that threats are what we distinguish from protected speech, then the General Assembly saying in E2, we don't mean to criminalize protected speech, I think it's very relevant to understanding what the General Assembly's intent was when it uses that word. Thank you, Your Honor. To answer Your Honor's question first, subsection D2 sets out affirmative defense, it does not set out a rule of instruction. In Relaford, this Court found that subsection D2 could not save the statute because all it does is set up an affirmative defense that somebody can raise a free speech defense at trial. The practical reality is that means that after the activist has been arrested for making some illusory statement that a cop thinks can be interpreted as a threat, after he's, you know, waited in jail for a year or two to get to trial, he can then raise the affirmative defense. It does not help at all because the prospect of awaiting trial in jail is enough to deter lawful uses of speech and therefore the statute is overbroad. I'd also point out that the U.S. Supreme Court has not read a savings clause like this as a kind of rule of instruction. The United States versus Stevens, that was the case that invalidated the federal bar on depictions of animal abuse. That statute issued in Stevens also had a savings clause like this. I believe the Third Circuit's decision citing the savings clause might be cited in the reply brief. The U.S. Supreme Court did not say that, well, there's a savings clause, therefore we can read the statute to be something different than the legislature actually enacted to something that we think is more constitutional. The savings clause doesn't work that way. If anything, it indicates some legislative concern that they might have written too broad a statute in the first place. Now, Your Honors, the first issue of the briefs really hinge on when we think courts should read extra elements or extra terms into a statute to try to save it. There's a danger in doing that always. The one reason why we have the rule of constitutional avoidance to start with is because we presume the legislature is doing its job to pass constitutional statutes. But we already found in Relaford, Your Honors, found in Relaford that they tried to bar all distressing communications to or about someone. That is a patently unconstitutional means. And one reason that Stevens talks about when courts should strike down statutes on their face is to create an incentive for legislatures to draft clear constitutional statutes in the first place. Now, it's been two years since Relaford, and I think three since the initial appellate court decision in that case. We haven't seen the legislature act to try to clarify that it meant this statute should be construed narrowly. There hasn't been anything that's passed. To be sure, the legislature has taken some proper actions. It's gone forward and enacted narrower, more specific statutes, such as the unlawful disclosure of private sexual images statute that this court recently dealt with in Austin. We don't have to get at all the kind of behaviors that one might characterize as stalking in one broad sweep. When we try to do that, we end up sweeping in a host of our discourse, and we end up sweeping in a host of Illinoisans' ordinary conduct. I'd also point out that we have a specific legislative history and statutory history that would resolve and require this court to refuse the state's idea that when it used the term threatens, the legislature secretly meant to use the term in this technical constitutional sense and not in the ordinary sense of the word. When the legislature wants to specify what is threatened, it does that in the statute. It retained the old definition in subsection A3 of requiring a threat to be a threat of a violent crime. The legislature intentionally wrote out that narrowing element when they passed the new statute because the legislature wanted to broaden to capture as many of these behaviors as possible. Now, Your Honors, if there are no further questions, I'd ask that you reverse Mr. Ashley's convictions and reverse the appellate court's decision in this case. Thank you, Mr. Buesing, and also Mr. Fisher. Case number 123989, People v. Ashley, is taken under abidance. Case number 2.